ARTHUR R. DENMAN

v.

JOHN M. MENTZ et al.

[Filed September 17th, 1902.]

1. An easement of light is an encumbrance.

2. Where the owner of two lots conveyed the northerly one with a covenant against encumbrances and there was on the southerly lot a building with a garret window facing north, the covenant negatives the reservation by implication of an easement of light and air, in the absence of a "necessity" for such easement, and such necessity must be absolute.

*Mr. James E. Howell,* for the complainant.

*Mr. Henry Young,* for the defendants Mentz and Mahlman.

*Mr. Chandler W. Riker,* for the defendant Leschiner.

STEVENS, V. C.

This is a bill to rescind, on the ground of fraud, a contract to convey land. It appears that Mentz and Mahlman held title, as trustees, to the premises known as 855 Broad street. By a written contract, dated July 31st, 1901, they agreed to sell the property to one Leschiner for $42,000. On the same day Leschiner, by a written contract, agreed to sell to Bippart and Weber. On August 9th, 1901, the legal title being still in the trustees, Bippart and Weber, by written contract, agreed, for the sum of $50,000, to sell to the complainant. The bill alleges that Leschiner, acting as the agent of Bippart and Weber, made certain representations which were false in fact, though it does not allege that they were known by Leschiner to be false at the time he made them.

The bill states three such representations—*first,* that there was erected upon the premises a substantial brick building; *second,* that the premises were free and clear of all encumbrances, except taxes; *third,* that there was derived from the property an annual rental of $1,800.

Mr. Denman, in his evidence, only testifies to two. He says (1) that Leschiner told him there was "a nice brick house" on the property, or, as he puts it in another part of his evidence, "that the building was a good brick building," and (2) that Leschiner told him that the property was bringing in $1,800 a year.

Mr. Leschiner's testimony is not very different. He says that he told Mr. Denman that there was a good, substantial building on the property and that it rented for $1,800 a year, and that there was a lease on it for $1,800 a year until May, 1894.

There is no proof whatever that the house was not "a nice" or "good brick building." It appears that in 1849 James N. Quimby owned the lot in question and a lot adjoining on the south. On the former stood a one-story structure and on the latter a three-story dwelling-house. This dwelling has stood there for seventy years or more. The one-story structure was raised, probably thirty or forty years ago, and converted into a three-story building, such as it is to-day. As I understand the evidence, its lower timbers must have been fitted into the north wall of the adjoining three-story dwelling-house, while both lots were owned by the same person, and it was conveyed in that condition. When, after the severance of title, it was raised, it must have been by agreement with the then owner, Mrs. Seton, for it was built up in the same way. This method of construction was highly beneficial, for, the lot being very narrow—only fifteen feet and one inch in width—additional store space was thus gained. It stands on the business portion of Broad street, where land and frontage are very valuable. The complainant called Mrs. Seton as a witness on other points. He did not question her as to the defendants' right to have the timbers inserted in her wall. He makes no claim that any part of the structure is not rightfully there. It seems to me, therefore, that the proof is very far indeed from showing the repre-

sentation as to the house being a nice or good house to be false. Besides, Mr. Denman, who is a lawyer of experience, practicing in Newark, had ample opportunity, if he had chosen, to judge of the character of the building for himself.

The next representation concerns the rent. It is conceded that there was a written lease for $1,800. As a matter of grace, however, the landlord had verbally consented to accept $1,500, until the tenant "had the place started." Of this the agent had no knowledge. He communicated what he knew and his communication accorded with the legal rights of the parties. That what Mr. Denman learned subsequently was not the cause of his unwillingness to fulfill his agreement, is apparent from the fact that when he stated, as an objection to taking title, that the tenant was only paying $1,500, he was informed that the $300 would, if he desired, be made good to him, or, if he preferred, deducted from the contract price.

It is alleged, in the bill, that it was represented that the property was free and clear of encumbrance. No such representation is proved. If the complainant is entitled to any relief in this regard, it must be because of the provisions of his written contract. This contract provides, in the usual terms, that

"the party of the first part will convey or cause to be conveyed to the said party of the second part by deed of warranty free and clear of all encumbrances as per agreement of J. M. Mentz et al., trustee with S. Leschiner,"

the lot in question. The complainant, in his bill, alleges, not that the defendants refused to consummate the contract, but that he himself rescinded it on discovering the alleged fraud.

On this branch of the case one of plaintiff's contentions is that the property is encumbered by certain old mortgages, given, as the record shows, over one hundred years ago, and, so far as appears by the record, uncanceled. The proof is plenary that these mortgages have long since ceased to be liens.

Complainant's main contention, however, is based upon the following facts: When, in 1849, James M. Quimby was the owner of both the lots to which I have referred, the north side-wall of the larger structure contained an attic window, over-

looking the lot in question. On December 15th, 1852, Quimby, by deed containing full covenants of seizin, of warranty and against encumbrances, conveyed the lot in question to Francis Goken, through whom the defendants Mentz and Mahlman derive title. On January 1st, 1853, Quimby conveyed the premises adjoining on the south to one Seton. The argument is that, notwithstanding the warranty contained in the Quimby deed, the lot in controversy is burdened with an easement of light and air in favor of the garret window, which, it is said, cannot be obstructed or closed by the adjoining proprietor.

There are several answers to this contention. In the first place, as the proof stands, there was no representation whatever—much less a fraudulent representation—that the property was not encumbered. All that the contract provides is that the grantors *will* convey free of encumbrance. Before they had an opportunity of doing, or offering to do, so, the complainant gave notice that he would rescind. Even if this alleged easement were really an encumbrance, there is no proof that the defendants might not have complied with their contract by procuring a release of it. This in itself would be sufficient to defeat complainant's present claim, for the foundation on which it rests, viz., fraud, is utterly wanting. It must be remembered that this is not a suit for specific performance, but for rescission.

But if this difficulty were out of the way, there is another. The agreement is to convey free of encumbrance. The claim is that an easement of light is an encumbrance, and so, I think, is the weight of authority. *Huyck* v. *Andrews,* 113 N. Y. 84. If it is, then when Quimby, in 1849, conveyed the lots in question free of encumbrance, one of two things must have happened—either his covenant against encumbrances negatived the implied reservation of the easement, or it was broken as soon as made.

The decisions in this state on the general subject are quite numerous. It has been established that an easement of light and air, supplied to the windows of one person from the premises of another, cannot be acquired by a mere user for twenty years under a claim of right. It has also been held, in this court at least, that, in the language of Vice-Chancellor Pitney,

Denman v. Mentz.

in *Toothe* v. *Bryce, 5 Dick. Ch. Rep. 607,* "in cases of apparent
and continuous easement, upon the severance of the tenement,
a *reservation* of a *quasi* easement will take place on a conveyance
of the servient part whenever it would pass by way of *grant,* on
the conveyance of the dominant part." I quite agree with Vice-
Chancellor Pitney in thinking that this doctrine of mutuality
is not founded on solid ground, and that there is a substantial
difference between the grant of the dominant part, in terms that
are absolute, and the grant of the servient, in similar terms.
As to the latter, there is great force in the following observations
of Lord Westbury, in *Suffield* v. *Brown, 4 De G. J. & S. 185.*
He says: "I cannot agree that the grantor can derogate from
his own absolute grant, so as to claim rights over the thing
granted, even if they were, at the time of the grant, continuous
and apparent easements enjoyed by an adjoining tenement which
remains the property of the grantor. Consider the easements
as if they were rights, members and appurtenances of the ad-
joining tenement. *They still admit of being aliened or released,*
and the absolute sale and grant of the land on or over which
they are claimed is inconsistent with the continuance of any-
thing abridging the complete enjoyment of the thing granted,
which is separable from the tenement retained and can be aliened
or released by the owner." The cases in our own reports are,
nearly all of them, cases in which the dominant tenement was
first conveyed. In that class of cases there is nothing unreason-
able in holding that it is granted with all its appurtenances—
with everything necessary to its convenient and beneficial enjoy-
ment. It is quite different in the other class. Violence is done
to plain words by reserving what, in terms at least, is given.
I do not, however, pursue the subject. It is exhaustively con-
sidered in *Toothe* v. *Bryce, supra,* and I have only quoted the
passage from the judgment of Lord Westbury because of its
direct bearing upon the case at bar.

The conveyance of the lot in controversy was made, as I
have said, while Quimby was the owner of both lots, and was
first made. Now, if there be an existing easement, that ease-
ment arose, not out of long-continued enjoyment, because, as
has been shown, long-continued enjoyment in this class of cases

does not of itself, in this state, give rise to a right, but only of the implied reservation contained in the Quimby deed. While the Quimby deed is absolute in its terms, and while it purports to convey every interest which he had in the land granted, a reservation would, nevertheless, be implied, assuming that the light was "necessary" in the very lax sense in which that word has been used, were it not for the covenant against encumbrances, and Quimby's grantee would not be permitted to build upon this narrow lot in such manner as to obstruct the passage of light. In other words, as the land is situated, he would not be permitted to utilize a part of the lot for the purposes for which he undoubtedly bought it. But this reservation is, on plaintiff's contention, a breach of the covenant against encumbrances, and so, the moment Quimby conveyed, he became, if the argument be sound, liable, on his covenant, to substantial damages. I cannot imagine that the law would countenance any such absurdity. The presence of the covenant against encumbrance would seem to me to negative the implication of a reservation and narrow the necessity to absolute necessity—*e. g.,* to the case of a way of necessity, given by the policy of the law, that no land may be made inaccessible or useless. But if, notwithstanding this covenant, it should be held that there was an implied reservation in the Quimby deed, the court, to prevent an absurd consequence, would be constrained to hold that the covenant did not extend to the reservation; in other words, that it only extends to what was actually conveyed, viz., the land, minus the thing reserved. But if this were so, the consequence would be that when the present defendants agreed, under seal, and hence covenanted, to convey the same lot free from encumbrance, they could perform their agreement by conveying the lot in the situation in which they held it. It would be a manifest absurdity to hold that Quimby's covenant meant one thing and that the defendants' covenant, conceived in the same terms, meant another. The whole difficulty is obviated by holding that the covenant against encumbrances negatives the idea of reservation by implication, except where the necessity is, as I have said, absolute.

I think there is still another ground on which, as the proofs stand, the bill might be dismissed, viz., that the window is not shown to be "necessary," under any definition of that word found in the books; but I say this in the absence of the owner and on the proofs as they now stand, and without any intention of prejudicing her in showing the contrary.

I think, in any view of the case, the bill should be dismissed.